UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JESSICA CRANMER,

                        Plaintiff,

         v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

_____

<u>DECISION & ORDER</u>

15-CV-6261P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Jessica Cranmer ("Cranmer") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 6).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 16, 18).  For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.     Procedural Background

Cranmer protectively filed for SSI on February 21, 2012, alleging disability beginning on August 1, 2009, as a result of post-traumatic stress disorder ("PTSD"), major depressive disorder, irritable bowel syndrome, asthma, chronic obstructive pulmonary disorder ("COPD"), osteoarthritis, urinary incontinence, rheumatoid arthritis, fibromyalgia, acid reflux, and anxiety.  (Tr. 206, 215).[1]  On May 31, 2012, the Social Security Administration ("SSA") denied Cranmer's claim for benefits, finding that she was not disabled.  (Tr. 132).  Cranmer requested and was granted a hearing before Administrative Law Judge Jennifer Smith (the "ALJ").  (Tr. 107, 145, 167-71).  The ALJ conducted a hearing on April 29, 2013.  (Tr. 107-31).  In a decision dated July 19, 2013, the ALJ found that Cranmer was not disabled and was not entitled to benefits.  (Tr. 87-106).

On March 31, 2015, the Appeals Council denied Cranmer's request for review of the ALJ's decision.  (Tr. 1-7).  In the denial, the Appeals Council considered additional medical treatment records predating the ALJ's determination that were not submitted until after the ALJ had rendered her decision.  (Tr. 1-2, 5, 610-56).  The Appeals Council determined that these records did "not provide a basis for changing the [ALJ's] decision."  (Tr. 2).  The Appeals Council also reviewed medical records and a medical source statement postdating the ALJ's decision (Tr. 2, 10-15, 22-86) and concluded that those records related to "a later time."  (*Id.*).  Cranmer commenced this action on May 2, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

II.    **Relevant Medical Evidence**[2]

A.    **Treatment Records Predating ALJ Decision**

Cranmer's treatment records suggest that she initially received mental health treatment from her primary care provider, Jan Goossens ("Goossens"), MD, FACP, at the Big Flats Clinic of the Guthrie Medical Group, P.C.  (Tr. 490-91).  Those records indicate that Cranmer originally complained of depression and stress and was prescribed Lexapro to manage her symptoms.  (*Id.*).  On August 4, 2004, Goossens discontinued Lexapro and prescribed Effexor instead to manage Cranmer's ongoing mental health symptoms.  (*Id.*).  On October 12, 2005, Cranmer attended another appointment with Goossens complaining of stress and anxiety. (Tr. 488-89).  Treatment notes indicate that due to side effects with Lexapro and Effexor, Goossens prescribed Zoloft.  (*Id.*).

Treatment notes from January 2009 suggest that Cranmer continued to suffer from anxiety and had been prescribed Effexor, which helped to alleviate her symptoms and no longer caused side effects.  (Tr. 480-82).  Cranmer complained of numbness and loss of feeling in her hands.  (*Id.*).  Rodrigro Samodal ("Samodal"), MD, assessed that Cranmer suffered from anxiety disorder and depression.  (*Id.*).  He prescribed Xanax and recommended counseling. (*Id.*).

Cranmer returned for an appointment with Samodol on February 16, 2009. (Tr. 478-80).  Cranmer reported that her dysesthesia and other symptoms had improved with the Xanax.  (*Id.*).  On February 23, 2009, Cranmer attended another appointment with Goossens. (Tr. 476-78).  She complained of feelings of derealization, which she attributed to Effexor.  (*Id.*).

---

[2] Those portions of the treatment records that are relevant to this decision are recounted herein.  Cranmer does not challenge the ALJ's physical RFC determination.  Accordingly, records relating to her physical impairments are only discussed to the extent they contain information pertinent to her mental impairments.

Cranmer reported that her depressive symptoms had improved, although she continued to experience anxiety.  (*Id.*).  Goossens prescribed Lexapro.  (*Id.*).

On June 15, 2009, Cranmer returned for another appointment with Goossens and reported improved symptoms.  (Tr. 474-75).  Cranmer indicated that she had not taken the prescribed Lexapro, but that her derealization symptoms had improved with a lower dose of Effexor.  (*Id.*).  Treatment notes from an August 12, 2010, appointment with Goossens indicate that Cranmer had obtained an order of protection against her spouse as a result of an incident in which he had held a gun to her head.  (Tr. 460-64).  Goossens assessed insomnia and panic anxiety syndrome and prescribed Ambien and Ativan.  (*Id.*).

Cranmer returned on September 13, 2010, complaining of increased anxiety, panic attacks, and insomnia.  (Tr. 457-59).  Goossens assessed depression, anxiety disorder, and insomnia and prescribed Effexor and Ambien.  (*Id.*).  Cranmer returned on November 30, 2010, complaining of continued symptoms of anxiety and depression.  (Tr. 446-49).  The treatment notes indicate that Cranmer was taking Effexor and Ambien.  (*Id.*).  Goossens advised Cranmer to consult with a psychiatrist.  (*Id.*).

On September 16, 2010, John Deines ("Deines"), MD, a psychiatrist at Family Services of Chemung County Mental Health Services ("FSCC"), conducted a psychiatric evaluation of Cranmer.  (Tr. 330-31).  Deines diagnosed Cranmer with PTSD and depressive disorder, not otherwise specified.  (*Id.*).  According to Deines, Cranmer's primary stressor was her increasingly abusive relationship with her husband, which had recently involved an incident in which he had put a gun to her head.  (*Id.*).  At the time of the evaluation, Cranmer was taking Effexor, Ativan, and Ambien, as prescribed by her primary care physician, and Deines continued her medication and advised her to return in one month.  (*Id.*).  Cranmer did not return for

appointments with Deines or her therapist Barb Stager ("Stager"), MSW, and her case was closed. (*Id.*).

On January 18, 2011, Cranmer returned to FSCC for an intake evaluation with Lezlie Namaste ("Namaste"), LMSW. (Tr. 322-26). Cranmer reported that she had been referred for evaluation by her primary care physician due to depressed feelings, anxiety, panic attacks, and nightmares. (*Id.*). According to Cranmer, she had been a victim of physical abuse perpetrated by her husband in July 2010. (*Id.*). She also reported having suffered verbal abuse for the previous ten years. (*Id.*). Cranmer reported feelings of fear, panic, anxiety, nightmares, insomnia, low energy, stress, and a decreased desire to leave her house. (*Id.*). At the time of the appointment, Cranmer was living in an apartment with her two teenage sons. (*Id.*).

Cranmer reported that she had been married three times, twice to her current husband. (*Id.*). She had recently left her husband after he had put a gun to her head and she had an order of protection against him. (*Id.*). Her husband was facing criminal charges resulting from the incident. (*Id.*). Cranmer explained that her husband harassed her and had other men stalk her. (*Id.*). She reported feeling fearful all the time and experienced high levels of anxiety and panic attacks, characterized by chest pain, palpitations, and profuse sweating. (*Id.*). She reported poor concentration, difficulty sleeping, low energy, sadness, and low self-esteem. (*Id.*).

Upon examination, Cranmer presented as alert, with full orientation, constricted affect, depressed mood, good eye contact, unspontaneous speech, normal memory, normal psychomotor activity, no evidence of conceptual disorganization or hallucinations, preoccupied thought content, guarded attitude, minimal insight, poor judgment, and distractible concentration. (*Id.*). According to Namaste, Cranmer cried throughout the interview, and although she was pleasant and cooperative, she was slow to answer questions. (*Id.*). Namaste assessed that

Cranmer suffered from PTSD, depressive disorder not otherwise specified and rule out panic disorder with agoraphobia. (*Id.*). She assessed a Global Assessment of Functioning ("GAF") of 52. (*Id.*). She recommended individual therapy, a medication assessment, and a domestic violence survivors group. (*Id.*).

Cranmer attended a therapy session with Stager on January 26, 2011. (Tr. 351-52). The treatment notes indicate that Cranmer reported being harassed by her husband's friends and suffering from panic attacks and nightmares. (*Id.*). Stager recommended that Cranmer participate in a domestic violence group. (*Id.*).

In February 2011, Cranmer attended appointments with Stager and Deines. (Tr. 327-32). During her appointment with Stager, Cranmer reported that her estranged husband had an upcoming court appearance, which was causing her anxiety. (*Id.*). Cranmer presented with symptoms of anxiety, depression, and panic, and Stager discussed coping mechanisms to help relieve Cranmer's symptoms. (*Id.*). Cranmer also reported that she was less comfortable going outside because of concerns for her safety. (*Id.*).

Cranmer cancelled her appointment with Stager on February 14, 2011, and attended her appointment with Deines on February 24, 2011. (*Id.*). Cranmer reported an increase in the severity of her symptoms, including hearing gun shots and mice running through her house. (*Id.*). She also reported periods of derealization during which she was unable to feel pain. (*Id.*). Cranmer complained of severe anxiety, panic attacks, low energy, poor sleep, poor appetite, and poor concentration. (*Id.*). Deines noted that Cranmer presented with a "distant" look and frequently paused before responding to questions. (*Id.*). He diagnosed her with major depressive disorder, single episode, and PTSD. (*Id.*). He assessed a GAF of 45 and prescribed Seroquel to assist with sleep. (*Id.*).

Cranmer attended several appointments with Stager and Deines during March 2011. (Tr. 333-46). On March 1, 2011, Cranmer met with Stager and reported that Seroquel was assisting with sleep, although she continued to hear gunshots inside her home and mice and birds outside her home. (*Id.*). Cranmer reported not wanting to leave her home and that others followed her and waved at her when she did leave. (*Id.*). She also reported difficulties with her memory and ability to speak. (*Id.*). According to Cranmer, she had spoken with the district attorney handling her husband's criminal matter and informed him that she was not mentally capable of testifying against her husband. (*Id.*). Cranmer also reported that she had begun the process of applying for SSI. (*Id.*). Stager noted that Cranmer was mildly cooperative during the session, but that she sometimes exhibited a blank stare when Stager was speaking. (*Id.*).

On March 10, 2011, Cranmer met with Deines and reported decreased depression, anxiety, episodes of derealization, and difficulty sleeping, although she continued to suffer from auditory hallucinations, feelings of fear, and nightmares. (*Id.*). She reported that her husband had pled guilty to the criminal charges and she still had an order of protection. (*Id.*). Deines noted that Cranmer continued to exhibit a "distant" look and frequently paused before responding to questions. (*Id.*). Deines increased Cranmer's dosage of Seroquel. (*Id.*).

Cranmer returned for an appointment with Stager on March 15, 2011. (*Id.*). During the appointment, Cranmer reported fatigue, although she was sleeping better. (*Id.*). She also reported continued auditory hallucinations, including gun shots, cars with loud music, a diesel truck, a whining puppy, and people walking upstairs. (*Id.*). She continued to experience nightmares and was worried because she believed that her husband's family had learned where she was living. (*Id.*). Cranmer met with Deines the following day and reported improved sleep and calmer thoughts, but continued auditory hallucinations. (*Id.*). According to Deines,

Cranmer continued to pause before speaking, although Cranmer reported that she was doing this less than before. (*Id.*). Cranmer also complained of feeling itchy or that something was crawling on her after taking Seroquel. (*Id.*). Deines instructed her to continue her medications, but to return in one week to evaluate whether she continued to experience side effects from Seroquel. (*Id.*).

Cranmer returned for an appointment with Deines on March 23, 2011. (*Id.*). Deines noted that Cranmer appeared more focused and did not exhibit the "distant" look and that the rhythm of her speech was much more normal. (*Id.*). Cranmer reported that her ability to speak had improved, her depression and anxiety were significantly lessened, and she had experienced minimal episodes of derealization. (*Id.*). Cranmer also reported that she continued to have feelings of fearfulness and paranoia and continued to have occasional auditory hallucinations of gunshots approximately three or four times per week. (*Id.*). Cranmer reported that she continued to feel itchiness after taking Seroquel. (*Id.*). Deines was concerned that Cranmer was allergic to Seroquel and prescribed Abilify instead. (*Id.*).

On March 29, 2011, Cranmer attended a therapy session with Stager. (*Id.*). Cranmer reported that she was feeling better, but that since switching to Abilify she was sleeping poorly and continued to experience auditory hallucinations and chest pain. (*Id.*). Cranmer also reported that she had called and requested to discontinue Abilify and restart Seroquel. (*Id.*). According to Cranmer, she continued to experience some itchiness on Seroquel, but that it had diminished. (*Id.*).

Two days later, Cranmer attended another appointment with Deines. (*Id.*). She reported improved sleep since switching back to Seroquel and minimal side effects. (*Id.*). Cranmer also reported increased anxiety, fearfulness, and paranoia, which she attributed to

continued harassment by her estranged husband of her boyfriend and her.  (*Id.*).  Deines

increased Cranmer's Seroquel dosage and advised her to contact the police if her husband

contacted her again.  (*Id.*).

In April 2011, Cranmer attended two sessions with Stager and one appointment

with Deines.  (Tr. 347-54).  During these appointments, Cranmer reported experiencing crying

spells and continued auditory hallucinations, although she reported her feelings of fearfulness,

paranoia, and panic attacks had lessened.  (*Id.*).  She had commenced divorce proceedings

against her husband and was attempting to serve the papers on him without success.  (*Id.*).

Deines decided not to alter Cranmer's medications.  (*Id.*).

Cranmer met twice with both Deines and Stager during May 2011.  (Tr. 355-62).

In early May, Cranmer reported a decrease in her feelings of fearfulness, paranoia, and panic

attacks, but continued frequent auditory hallucinations, depressed feelings, and low energy.

(*Id.*).  Cranmer also reported panic attacks after encounters with her husband or his family

members.  (*Id.*).  Deines recommended that Cranmer participate in domestic violence group

therapy and increased her Effexor dosage.  (*Id.*).

On May 25, 2011, Cranmer attended unscheduled crisis sessions with both Stager

and Deines due to an increase in her symptoms.  (*Id.*).  According to Cranmer, she was planning

to go to the emergency room because she was experiencing increased depression, panic, anxiety,

and auditory hallucinations.  (*Id.*).  She presented as tearful and upset and reported having been

crying for the previous hour while staying in her basement due to fear.  (*Id.*).  During the session,

Cranmer calmed down and discussed that her panic attacks and anxiety were triggered by an

incident with her family members.  (*Id.*).  Cranmer reported to Deines that her symptoms were

worsening due to increased auditory hallucinations.  (*Id.*).  Deines increased Cranmer's Seroquel

9

dosage and decreased her dosage for Ativan and Effexor.  (*Id.*).  As an option, Deines offered

psychiatric hospitalization to permit Cranmer's medications to be adjusted quickly and

aggressively.  (*Id.*).

Cranmer returned for an appointment with Deines on June 9, 2011.  (Tr. 364-65).

Cranmer reported that her depression, anxiety, and auditory hallucinations had been alleviated by

her medication adjustment.  (*Id.*).  She reported sleeping approximately ten hours a night and

feeling tired during the day, and Deines advised her that she could decrease her Seroquel dosage

to avoid excessive sedation.  (*Id.*).  Cranmer also reported going to the emergency room the

previous week for chest pain, which she believed was anxiety-related.  (*Id.*).  She indicated that

she continued to encounter associates of her husband, but that the divorce papers had been served

and she expected the divorce to be finalized within the next month.  (*Id.*).

Cranmer did not attend her scheduled session with Stager on June 30, 2011, but

met with Deines on July 7, 2011.  (Tr. 366-68).  Cranmer reported continued improvement in her

depression and anxiety and that she had not experienced any auditory hallucinations.  (*Id.*).  She

also was sleeping well, although she continued to experience some sedation during the day.

(*Id.*).  According to Cranmer, she was driving a new vehicle that was not known to her husband

or his friends and she had not experienced any recent incidents involving them.  (*Id.*).

In August 2011, Cranmer met with both Deines and Stager.  (Tr. 369-72).  Deines

noted that Cranmer had not met with Stager in approximately two months and emphasized the

importance of ongoing therapy.  (*Id.*).  Cranmer indicated that she had been doing so well that

she had delayed contacting Stager.  (*Id.*).  According to Cranmer she was not experiencing any

auditory hallucinations and her sleep and mood had improved.  (*Id.*).  She continued to be

drowsy during the day and had experienced a few nightmares.  (*Id.*).  She had not experienced

any encounters with her husband.  (*Id.*).  Cranmer reported that she had befriended a woman who had moved into the apartment above hers and had attended yard sales and demolition derbies with her.  (*Id.*).

Cranmer returned for an appointment with Deines on September 29, 2011, after cancelling an earlier scheduled appointment.  (Tr. 373-74).  During the appointment, Cranmer reported increased anxiety and nightmares, which she attributed to her estranged husband, who had started stalking her sister.  (*Id.*).  Cranmer had not obtained the bloodwork requested by Deines and had not scheduled any appointments with the therapist who was covering for Stager, who was out on medical leave.  (*Id.*).  Deines questioned whether Cranmer was taking more than her prescribed dosage of Ativan and advised her to obtain bloodwork.  (*Id.*).

Cranmer met with both Deines and Stager in October 2011.  (Tr. 376-79). Cranmer reported increased anxiety and nightmares caused by encounters with her estranged husband.  (*Id.*).  She also reported that her son was experiencing mental health issues and her grandmother had passed away.  (*Id.*).  According to Cranmer, she believed her son was having an inappropriate relationship with her sister's partner.  (*Id.*).  Cranmer reported that her current psychiatric medication regimen was helping significantly, but that she continued to experience anxiety, particularly when she saw her estranged husband.  (*Id.*).  Deines discontinued Cranmer's prescription for Ativan and instead prescribed Klonopin.  (*Id.*).  Cranmer missed her appointment with Stager scheduled for October 27, 2011.  (*Id.*).

Cranmer met with Stager three times during November 2011.  (Tr. 380-82). Initially, Cranmer reported a reduction in her anxiety, panic, and nightmares after switching to Klonopin.  (*Id.*).  However, in mid-November, Cranmer reported increased stressors in her life. (*Id.*).  According to Cranmer, one of her sons totaled his truck during a traffic accident and a

11

nodule on his lung had been discovered, which Cranmer feared was malignant.  (*Id.*).

Additionally, her estranged husband had chased her boyfriend in his vehicle.  (*Id.*).  Her

youngest son was improving with medication, but continued to have difficulty sleeping.  (*Id.*).

Cranmer reported that she continued to experience some relief from Klonopin and had not

experienced any chest pain.  (*Id.*).  During the next appointment, Cranmer reported that her son's

lung nodule was not cancerous and she was experiencing decreased stress and anxiety.  (*Id.*).

Cranmer did not attend an appointment scheduled with Stager on December 1,

2011, but met with Deines on December 22, 2011.  (Tr. 383-84).  During the appointment,

Cranmer indicated that she was doing better overall on the Klonopin, but that she had

experienced a recent increase in anxiety due to an incident involving her estranged husband's

family member.  (*Id.*).  Cranmer also reported less frequent nightmares.  (*Id.*).  Deines advised

Cranmer that she could take an additional dose of Klonopin as needed when she experienced

increased anxiety.  (*Id.*).

Cranmer met with Stager once during January 2012.  (Tr. 386-87).  During the

appointment, she reported that she continued to sleep well and had experienced less anxiety.

(*Id.*).  Cranmer described her daily routines, and Stager advised her to monitor her caffeine

intake.  (*Id.*).  Cranmer reported that she was exercising, had started sewing, and had a positive

experience with her family during the holidays.  (*Id.*).  Cranmer reported some nightmares and

some obsessive compulsive disorder symptoms.  (*Id.*).

In February 2012, Cranmer met with Stager three times.  (Tr. 388-91).  During the

appointments, Cranmer reported some positive occurrences in her life and a slight reduction in

anxiety and depression.  (*Id.*).  According to Cranmer, she had been taking care of a baby goat,

had obtained a new hairstyle, and had assisted the woman who lived above her.  (*Id.*).  Cranmer

continued her attempt to obtain SSI benefits and reported an onset of physical pain. (*Id.*).  She was being evaluated for rheumatoid arthritis and had been prescribed pain medication. (*Id.*). Stager counseled her regarding her various prescriptions, and Cranmer reported difficulty with her memory. (*Id.*).  Cranmer also reported that her son continued to struggle with mental health issues, which caused Cranmer to experience increased anxiety. (*Id.*).

On March 6, 2012, Cranmer attended another appointment with Stager. (Tr. 392). During the appointment, Cranmer reported increased anxiety and stress and that she continued to have difficulty with her son, who was demonstrating increased aggression and depression. (*Id.*). Cranmer reported that she also was experiencing difficulty because the anniversary of her mother's death was approaching. (*Id.*).  Cranmer requested another appointment with Stager later that week. (*Id.*).

Two days later, on March 8, 2012, Cranmer met with both Stager and Deines. (Tr. 393-97).  Cranmer met with Stager first, who described Cranmer as confused and unfocused. (*Id.*).  Cranmer reported ongoing difficulties with her son, who was living with his grandfather, and auditory hallucinations. (*Id.*).  Stager helped Cranmer with her SSI paperwork. (*Id.*).  Stager observed that Cranmer appeared drowsy, overly-controlled and restrained, with a flat affect, empty mood, good eye contact, slowed speech, normal memory, slowed psychomotor activity, a mild degree of conceptual disorganization, and poor attention span. (*Id.*).

Later that day Cranmer met with Deines. (*Id.*).  During the appointment, Cranmer reported experiencing varying degrees of depression and anxiety and occasional nightmares. (*Id.*).  She reported ongoing difficulties with her son and with finalizing her divorce. (*Id.*).  She believed that her medication regimen continued to work adequately. (*Id.*).  Deines continued her current medications, but altered the prescriptions to comply with Medicaid requirements. (*Id.*).

Cranmer's next appointment with Stager was on April 17, 2012.  (Tr. 611-12).

Cranmer presented as lethargic with a blank, emotionless stare, and hesitation and delay before

speaking.  (*Id.*).  Cranmer explained that she had been recently diagnosed with fibromyalgia and

had begun taking Neurontin for pain, which was "kicking [her] butt."  (*Id.*).  Cranmer reported

that she had to be driven to the appointment because she was unable to drive herself.  (*Id.*).  She

also reported that she had not been able to take Seroquel and was experiencing withdrawal

symptoms, including shakiness, slurred words, hot flashes, and sweating.  (*Id.*).  Her son

continued to refuse to attend school, and Stager helped her complete SSI paperwork.  (*Id.*).

Cranmer reported that she was sewing, planning a terrarium, riding a bicycle for exercise, and

camping.  (*Id.*).

On May 3, 2012, Cranmer met with Deines.  (Tr. 613-14).  Cranmer explained

that she had been recently diagnosed with fibromyalgia and was taking Neurontin and Cymbalta.

(*Id.*).  Cranmer indicated that the medications had not yet alleviated her symptoms, and Deines

noted that she appeared to have a delayed response.  (*Id.*).  Deines advised that Cymbalta and

Effexor work similarly and that she should not be taking both medications.  (*Id.*).  Deines

advised Cranmer to discontinue Cymbalta.  (*Id.*).  Cranmer discussed ongoing issues with her

son's mental health and with obtaining her divorce.  (*Id.*).  Deines determined that he would

monitor her every three months.  (*Id.*).

Cranmer cancelled her scheduled appointments with Stager in May and June 2012

and did not meet with her again until July 9, 2012.  (Tr. 615-17, 656).  At that time, Cranmer

reported positive adjustment to her fibromyalgia medication, which had previously caused her to

be sedated.  (*Id.*).  She also reported being more active and that she had been getting out and

going to yard sales.  (*Id.*).  Although she continued to have anxiety, she reported that it had

14

lessened since she had begun mental health treatment.  (*Id.*).  Cranmer reported that she was attempting to stop smoking and discussed her goals and objectives.  (*Id.*).  She also reported that she was using her coping skills to deal with her son's ongoing mental health issues and his recent hospitalization.  (*Id.*).

On July 21, 2012, Cranmer presented to the emergency room at St. Joseph's Hospital complaining of depression, anxiety, inability to talk, and symptoms of derealization.  (Tr. 559-64).  She indicated that she was stressed and overwhelmed because she had to move out of her apartment.  (*Id.*).  Cranmer was held overnight and discharged the following day.  (Tr. 560-61, 575-77).  Upon discharge, Cranmer was advised to continue her current medications and to follow up with FSCC as scheduled.  (*Id.*).

Deines rescheduled his appointment with Cranmer on July 26, 2012, and Cranmer cancelled her July 30 appointment with Stager because she had been hospitalized in the Behavioral Services Unit of the local hospital.  (Tr. 618-21).  Cranmer met with Deines on August 1, 2012, and informed him that she had been admitted to the hospital after presenting there in a dissociative state, during which she had experienced difficulty talking, decreased sense of pain, and feeling "out of touch" with her body.  (*Id.*).  She was tested for neurological problems, but her results were normal, and she was discharged without changes in her medications.  (*Id.*).

Cranmer reported that prior to her hospitalization she was dealing with several stressors, including family discord, hot weather, and learning that she had been denied SSI benefits.  (*Id.*).  Cranmer reported experiencing similar dissociative states previously, once in 2009 when her mother died and the other in 2002 during a period of family conflict.  (*Id.*).  She also indicated that she had run out of Klonopin and had not taken it for approximately three

weeks prior to her hospitalization.  (*Id.*).  Cranmer denied overusing Klonopin and indicated that she believed someone had stolen some of her medication.  (*Id.*).  She also reported that her primary care physician had advised her to stop taking Effexor and to take Cymbalta instead.  (*Id.*).  He also switched her prescription for Neurontin to Lyrica.  (*Id.*).  Cranmer reported continuing to experience significant pain symptoms.  (*Id.*).

During the appointment, Cranmer interacted appropriately and did not demonstrate any delayed responses.  (*Id.*).  Her condition had improved, and she was no longer experiencing dissociative symptoms.  (*Id.*).  Deines questioned whether Cranmer was taking more than the prescribed dosage of Klonopin, and he emphasized that she was not to take more than prescribed.  (*Id.*).  Deines continued her current medication regimen.  (*Id.*).

Cranmer attended a session with Stager on August 1, 2012.  (Tr. 622-23).  During the session, Cranmer reported that several factors had triggered the episode resulting in her hospitalization, including extreme heat, raised voices, and loud music.  (*Id.*).  She also indicated that a friend had complained about her dog.  (*Id.*).  Cranmer told Stager that she had started smoking again and had been able to leave her home and to go camping.  (*Id.*).  According to Cranmer, she experienced agitation and anxiety in large or noisy crowds.  (*Id.*).  Stager advised Cranmer that she needed to attend appointments more regularly.  (*Id.*).

Cranmer failed to attend her next two scheduled appointments.  (Tr. 624-25).  On September 12, 2012, Cranmer attended an appointment with Deines.  (Tr. 535-36).  During the appointment, Cranmer reported that she continued to experience stress due to her teenage son moving in with her father and continuing a relationship with a thirty-year-old woman.  (*Id.*).  Cranmer indicated that she continued to suffer from depression and anxiety, but that her primary concern was increased agitation, triggered by fighting and loud music in the upstairs apartment.

16

(*Id.*).  She indicated that she had not experienced any dissociative episodes since her discharge

from the hospital and had been able to relax and enjoy herself when camping with her boyfriend.

(*Id.*).  Deines recommended that Cranmer increase her Seroquel dosage and continue to take her

other medications.  (*Id.*).

During October 2012, Cranmer attended appointments with both Deines and

Stager.  (Tr. 537-38, 626-27).  Cranmer reported that she had been visiting with her father more

and that her son had begun living with her father.  (*Id.*).  According to Cranmer, her son had

admitted being involved with an older woman, who was his aunt's partner.  (*Id.*).  Cranmer

presented as calm, but complained of stress and anxiety due to the situation.  (*Id.*).  Cranmer

indicated that she had contacted Child Protective Services.  (*Id.*).  Cranmer also reported that her

boyfriend had lost his job.  (*Id.*).  Cranmer told Deines that the increased Seroquel dosage had

significantly alleviated her anger, although she continued to experience some anxiety and

depression.  (*Id.*).  Cranmer indicated that her main concern was her recent difficulty being

around large groups.  (*Id.*).  Cranmer failed to attend her appointment with Stager scheduled for

October 16, 2012.  (Tr. 629).

On November 7, 2012, Cranmer attended an appointment with Deines.

(Tr. 539-40).  Deines had reviewed the medical records from Cranmer's hospital admission and

opined that her dissociative state was a psychological reaction to the stress she was experiencing

at the time.  (*Id.*).  Cranmer reported that she had been evicted from her apartment because she

could not pay the rent and was living with her boyfriend's family in Pennsylvania.  (*Id.*).  She

reported that her anger, depression, and anxiety were well-controlled, with the exception of a

panic attack she experienced after observing her estranged husband at the grocery store.  (*Id.*).

Deines noted that Cranmer's poor attendance continued to be an ongoing issue, and he stressed the importance of attending therapy sessions.  (*Id.*).

On November 29, 2012, Cranmer attended a session with Stager and reported that she was experiencing less stress since moving from Elmira.  (Tr. 628).  Stager noted that Cranmer appeared calmer and more focused than in previous sessions.  (*Id.*).  Cranmer was currently homeless and staying with friends in Pennsylvania.  (*Id.*).  She reported decreased anxiety and that her medications were working adequately.  (*Id.*).  She also indicated that she had been going out more, including to sales and to eat with friends, although she had a recent panic attack after observing her estranged husband in the grocery store.  (*Id.*).  She had not yet decided whether to stay in Pennsylvania and whether to transfer services to medical professionals located in that state.  (*Id.*).

Cranmer met with Deines on December 5, 2012.  (Tr. 541-42).  She reported that she was living with her boyfriend's family in Pennsylvania and spending time in her camper in Pennsylvania.  (*Id.*).  Cranmer indicated that she intended to apply for Medicaid in Pennsylvania, but hoped to continue mental health services at FSCC.  (*Id.*).  She reported feeling more relaxed and that her depression, anxiety, and anger were well-controlled.  (*Id.*).  She had not experienced any panic attacks since their last meeting and only had trouble with anxiety when she stayed in Elmira for extended periods.  (*Id.*).  Her son had moved in with her father and was doing better. (*Id.*).  She wanted to continue her current medication regimen.  (*Id.*).  Cranmer failed to attend an appointment with Stager on December 19, 2012, and an appointment with Deines on January 2, 2013.  (Tr. 634-35).

Cranmer met with Deines on January 9, 2013.  (Tr. 543-44).  During the appointment, she reported that her anger, depression, and anxiety continued to be

well-controlled, although she had experienced a few mild panic attacks.  (*Id.*).  She had not yet

applied for Medicaid in Pennsylvania and wanted to continue to receive services at FSCC.  (*Id.*).

Deines noted that she had missed her appointment with Stager and counseled her regarding her

need to attend therapy sessions.  (*Id.*).  Deines renewed Cranmer's medication regimen, which

continued to manage her symptoms.  (*Id.*).

        Cranmer cancelled her next appointment with Deines, but attended an

appointment with him on February 14, 2013.  (Tr. 545-46, 633).  Deines noted that Cranmer

appeared to move and speak very slowly during the meeting.  (*Id.*).  Cranmer explained that her

New York Medicaid benefits had been terminated and, as a result, she was unable to afford her

medications.  (*Id.*).  She had decreased her Seroquel dosage and had stopped taking her pain

medications, including Tramadol, Lyrica, and Cymbalta.  (*Id.*).  Cranmer reported that her anger

continued to be controlled, but that she was becoming increasingly depressed and anxious, had

experienced frequent panic attacks, and had occasional suicidal thoughts.  (*Id.*).  She indicated

that she continued to live in a trailer in Pennsylvania and felt isolated.  (*Id.*).  She had not yet

completed the paperwork to apply for Medicaid in Pennsylvania.  (*Id.*).  Deines noted that

Cranmer had not met with Stager for more than two months and felt that Cranmer had not made

any attempt to schedule an appointment with Stager.  (*Id.*).  Deines emphasized the importance

of obtaining Medicaid and attending mental health appointments.  (*Id.*).  He encouraged Cranmer

to seek mental health services in Pennsylvania, where it would be easier for her to get to

appointments.  (*Id.*).  Deines counseled Cranmer to discuss with Stager ways to pay for a refill of

her Seroquel prescription, and he prescribed Prozac, which was less expensive than Cymbalta.

(*Id.*).  He also prescribed a low dose of Trazadone to assist with sleep.  (*Id.*).  Deines discussed

the possibility of psychiatric hospitalization, but Cranmer indicated she would like to avoid this option. (*Id.*).

Cranmer called to cancel her appointment with Stager on February 21, 2013. (Tr. 632). Cranmer explained that she had been in the hospital the previous evening due to a cyst on her ovary and was not able to find her car keys. (*Id.*). Stager cautioned that she would have to discuss continued services with a supervisor because Cranmer had not been attending appointments, no longer lived in New York State, and was unable to afford to pay for appointments or prescriptions. (*Id.*). Stager provided Cranmer with contact information for mental health service providers located in Pennsylvania. (*Id.*).

Cranmer did not attend an appointment with Deines scheduled for February 28, 2013, and apparently did not attend any other appointments at FCSS until April 3, 2013, when she met with Stager. (Tr. 630-31). Cranmer informed Stager that she had received prescriptions for Prozac, Klonopin, and Trazodone from her primary care physician and had recently begun taking the medications. (*Id.*). Stager counseled Cranmer regarding her commitment to mental health treatment and emphasized the need to use the services that were available to her. (*Id.*). Cranmer noted that she would soon be having ovarian surgery. (*Id.*). Cranmer cancelled her April 10, 2013, appointment with Deines. (*Id.*). (Tr. 637).

On April 17, 2013, Cranmer met with both Stager and Deines, both of whom noted that Cranmer appeared calmer and more clear than in the past. (Tr. 636, 638-39). Cranmer reported that she had recently moved back to Elmira and had obtained New York Medicaid. (*Id.*). She was currently taking Cymbalta, Trazodone, Tramadol, and Lyrica, which had been prescribed by her primary care doctor. (*Id.*). She reported a significant decrease in her depression, anxiety, and panic attacks and stated that she was no longer having suicidal thoughts.

(*Id.*).  Cranmer was applying for SSI benefits and expected to attend a hearing at the end of the month.  (*Id.*).  She was also scheduled for surgery the following day.  (*Id.*).  Cranmer reported that she still had not obtained a divorce from her husband and had experienced several panic attacks recently when she had observed her husband and his friend.  (*Id.*).

Cranmer met with Stager three times and with Deines once during May 2013. (Tr. 640-48).  Cranmer initially presented as clear and calm, although she became upset discussing her husband and the anticipated expiration of the order of protection.  (*Id.*).  Cranmer indicated that her anxiety and paranoia were increasing and that that she had begun to have nightmares.  (*Id.*).  By the end of May, Cranmer reported being in significant pain, and Deines noted that although she was calm and in better spirits, she appeared to be in pain, was slow to respond to questions, and exhibited problems with her memory.  (*Id.*).  Cranmer reported that her depression and anxiety were well-controlled by her medication, except when she saw her husband.  (*Id.*).

Cranmer met with both Stager and Deines in June 2013.  (Tr. 649-50, 654). During the appointments, Cranmer reported that her depression and anxiety were well-controlled and that she was sleeping well.  (*Id.*).  She noted that she had begun having intrusive dreams regarding her husband and had thoughts about getting back together with him.  (*Id.*).  Stager noted that their anniversary was approaching, which might be triggering her thoughts and anxiety.  (*Id.*).

Cranmer met with Stager on July 18, 2013.  (Tr. 655).  During the appointment, she reported a significant decrease in her anxiety and that she was planning to host a Tupperware party at her house in order to generate more income.  (*Id.*).  Cranmer reported some panic attacks

and depression and that she had not been feeling well.  (*Id.*).  Stager noted that her medical issues

might affect her mental health and encouraged her to become more active.  (*Id.*).

B.    **Treatment Records Postdating ALJ Decision**

Cranmer submitted to the Appeals Council additional treatment records from

FSCC documenting her treatment between July 24, 2013 and June 13, 2014, an approximately

one year period following the ALJ's decision.  (Tr. 22-85).   Those records demonstrate that

Cranmer generally presented as anxious and depressed, with slow reactions, during the summer

and fall of 2013.  (*Id.*).  During this time, Cranmer reported an increase in her mental health

symptoms, including nightmares, auditory hallucinations, racing thoughts, and anxiety.  (*Id.*).  In

early October 2013, Cranmer was admitted to the Behavioral Services Unit at St. Joseph's

Hospital due to symptoms of extreme depression, anxiety, and flashbacks.  (*Id.*).  She left the

hospital after four days.  (*Id.*).

Following her hospitalization, Cranmer reported that her depression and anxiety

were better controlled, although she continued to experience anxiety, depression, and

nightmares.  (*Id.*).  Cranmer also reported heightened anxiety due to pain and her other medical

issues.  (*Id.*).  Between April and June 2014, Cranmer reported feeling better overall with

improved sleep, although she continued to experience feelings of depression and anxiety.  (*Id.*).

On June 13, 2014, Stager opined that Cranmer was doing well.  (*Id.*).

C.    **Medical Opinion Evidence**

1.    **Jan Goossens, MD**

On November 30, 2010, Goossens, Cranmer's primary care physician, completed

an employability assessment.  (Tr. 270-71).  Goossens indicated that Cranmer suffered from

anxiety, depression, and low back pain.  (*Id.*).  He opined that Cranmer would be moderately

limited in her ability to maintain attention and concentration, make simple decisions, and function in a work setting at a consistent pace. (*Id.*). He also opined that Cranmer was unable to work due to ongoing depression and anxiety. (*Id.*).

### 2.   John Deines, MD

On February 16, 2012, Deines completed an employability assessment. (Tr. 305-06). He diagnosed Cranmer with major depressive disorder, single episode, unspecified, and PTSD. (*Id.*). He opined that Cranmer was moderately limited in her ability to understand, remember and carry out instructions, maintain attention and concentration, make simple decisions, interact appropriately with others, and maintain socially appropriate behavior without exhibiting extremes. (*Id.*). He also opined that Cranmer was very limited in her ability to function in a work setting at a consistent pace. (*Id.*). At the time of the assessment, Deines had been treating Cranmer for approximately fourteen months. (*Id.*). He indicated that Cranmer's symptoms prevented her from functioning well on an almost daily basis and opined that she would be unable to work or concentrate on a consistent basis. (*Id.*). He also opined that her symptoms prevented her from leaving her home at times. (*Id.*).

On June 19, 2014, Deines and Stager completed a mental medical source statement. (Tr. 10-15). They noted that Cranmer suffered from major depressive disorder and PTSD and assessed a GAF of 51. (*Id.*). Stager and Deines indicated that Cranmer was prescribed Trazodone, Prazosin, and Klonopin, which could cause dizziness, drowsiness, and lethargy. (*Id.*). They noted that Cranmer had experienced an overall reduction in her mental health symptoms, although her symptoms increased when Cranmer experienced increased physical pain. (*Id.*). They opined that her prognosis was good. (*Id.*).

According to Deines and Stager, Cranmer's symptoms included decreased energy, generalized persistent anxiety, recurrent and intrusive recollections of a traumatic experience that are a source of marked distress, apprehensive expectation, memory impairment, and sleep disturbance. (*Id.*). They opined that Cranmer was seriously limited[3] in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, understand remember and carry out detailed instructions, deal with stress of semiskilled and skilled work, travel in unfamiliar places, and use public transportation. (*Id.*). They further opined that Cranmer had no limitation in her ability to carry out very short and simple instructions, maintain regular attendance and be punctual within customary, usually strict tolerance, make simple work-related decisions, ask simple questions or request assistance, and adhere to basic standards of neatness and cleanliness. (*Id.*). Additionally, they reported that Cranmer was limited but satisfactory[4] in her ability to remember work-like procedures, understand and remember very short and simple instructions, work in coordination with or proximity to others without being unduly distracted, set realistic goals or make plans independently of others, interact appropriately with the general public, and maintain socially appropriate behaviors. (*Id.*).

Stager and Deines noted that Cranmer suffered from anxiety that interfered with her daily functioning and could require breaks to permit her to regain her composure. (*Id.*). Additionally, Cranmer's ability to concentrate and maintain her emotions were negatively affected by pain. (*Id.*). They reported that Cranmer suffered from stress, particularly when her

---

[3] "Seriously limited" was defined to be a "noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the workday or work week." (*Id.*).

[4] "Limited but satisfactory" was defined to mean a "noticeable difficulty (e.g., distracted from job activity) no more than 10 percent of the workday or work week." (*Id.*).

mental health symptoms were "high," and that she could become confused, forgetful or catatonic when experiencing symptoms. (*Id.*). They also noted that Cranmer's fear of the unknown and fear from past abuse inhibited her ability to travel alone. (*Id.*).

Stager and Deines opined that work activities involving speed, precision, complexity, deadlines, making decisions, working with other people, dealing with the public, remaining at work for a full day, criticism by supervisors, and fear of failure would likely cause Cranmer to experience stress. (*Id.*). They opined that she would be absent from work more than four days per month. (*Id.*).

### 3.    Sara Long, PhD

On May 9, 2012, state examiner Sara Long ("Long"), PhD, conducted a consultative psychiatric evaluation of Cranmer. (Tr. 410-12). Cranmer reported that she was thirty-seven years old and had driven herself to the examination. (*Id.*). Cranmer reported that she had completed high school in a normal class setting and had earned a nursing assistant certification. (*Id.*). Her last job was as a baker approximately two years earlier. (*Id.*). She reportedly left that employment because she was having problems after her mother passed away. (*Id.*). She resided with her two teenage sons. (*Id.*).

According to Cranmer, she had been receiving ongoing outpatient mental health medication since approximately 2008 and therapy since 2011. (*Id.*). According to Cranmer, she suffered from anxiety, depression, and PTSD. (*Id.*). She also reported recent weight loss and trouble sleeping. (*Id.*). Cranmer reported that she was able to care for her own personal hygiene, but needed assistance getting out of the bathtub. (*Id.*). She was able to cook, clean, wash laundry, and grocery shop, although she was limited in the amount she could carry. (*Id.*). She

also reported that cleaning and laundry caused her pain and fatigue.  (*Id.*).  She reported a good relationship with her family members and that she enjoyed sewing.  (*Id.*).

Upon examination, Long noted that Cranmer appeared neatly-dressed and well-groomed.  (*Id.*).  Long opined that Cranmer had fluent speech with clear voice and adequate language, coherent and goal-directed thought processes, full range of appropriate affect and euthymic mood, clear sensorium, full orientation, poor insight, poor to fair judgment, and average intellectual functioning.  (*Id.*).  Long noted that Cranmer's attention and concentration and memory were intact.  (*Id.*).  According to Long, Cranmer was able to complete the serial threes and could recall three out of three objects immediately, three out of three objects after delay, and could complete six digits forward and four digits backward.  (*Id.*).

According to Long, Cranmer could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, and relate adequately with others.  (*Id.*).  According to Long, Cranmer was capable of adequate stress management, but would benefit from additional stress management skills.  (*Id.*).  Long assessed that Cranmer suffered from anxiety disorder, not otherwise specified.  (*Id.*).  According to Long, although the examination suggested that Cranmer might suffer from psychiatric problems, the problems were not sufficiently significant to interfere with her ability to function on a regular basis.  (*Id.*).

### 4.   **T. Inman-Dundon, Psychology**

On May 21, 2012, agency medical consultant Dr. T. Inman-Dundon ("Inman-Dundon") completed a Psychiatric Review Technique.  (Tr. 414-18).  Inman-Dundon concluded that Cranmer's mental impairments did not meet or equal a listed impairment.

(Tr. 414-16).  According to Inman-Dundon, Cranmer suffered from mild limitations in her activities of daily living and ability to maintain social functioning and moderate limitations in her ability to maintain concentration, persistence, or pace.  (Tr. 417).  Inman-Dundon completed a mental Residual Functional Capacity ("RFC") assessment.  (Tr. 419-21).  Inman-Dundon opined that Cranmer suffered from moderate limitations in her ability to understand, remember and carry out detailed instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a work setting, and set realistic goals or make plans independently of others.  (*Id.*).

### 5. Rodrigo T. Samodal, MD

On March 8, 2013, Samodal completed a medication assessment.  (Tr. 507-08).  He indicated that Cranmer suffered from dyslipidemia, COPD, PTSD, fibromyalgia, depression, and anxiety.  (*Id.*).  Samodal opined that Cranmer had limited mental capability to sustain meaningful work throughout the day and that she was permanently disabled.  (*Id.*).

## III. Non-Medical Evidence

### A. Application for Benefits

Cranmer reported that she had been born in 1974 and had been employed previously as a baker, a packer for a moving company, a cashier, a certified nursing assistant, a housekeeper, and at a vineyard.  (Tr. 188, 227).  According to the application, Cranmer lived in an apartment with her two sons and was able to take care of, feed, water, and let her pets outside.  (Tr. 218-26).  Cranmer indicated that she was able to care for her personal hygiene without

assistance, although she needed reminders to take her medicine and attend appointments.  (*Id.*).
Cranmer reported that she could prepare boxed or frozen meals daily and was able to do
household chores, including laundry and light cleaning, but had difficulty carrying, lifting,
bending, or kneeling.  (*Id.*).  Cranmer indicated that her extreme pain limited her ability to lift a
coffee pot, open jars, and stoop.  (*Id.*).  Cranmer reportedly left her house weekly and was able to
go out alone, but was sometimes afraid to leave her home due to panic attacks, fear of men and
crowds, and dizziness.  (*Id.*).  Cranmer had a driver's license and was able to drive, provided she
was sufficiently alert.  (*Id.*).  Cranmer reported that she was able to shop two to three times a
month for approximately one to two hours, but required assistance.  (*Id.*).

   According to Cranmer, she was unable to pay bills, count change, or handle a
savings account, and sometimes had urges to shop in order to feel better.  (*Id.*).  During the day,
she watched television, sewed, and visited her family and friends.  (*Id.*).  She reported that she
slept twelve hours a night and took a three-hour nap each day.  (*Id.*).  According to Cranmer, she
had difficulty reading books and did not go out as frequently due to her fear of men and crowds.
(*Id.*).

   Cranmer reported that she had difficulty lifting, standing, walking, sitting,
climbing stairs, kneeling, squatting, reaching, grabbing, and seeing.  (*Id.*).  She also reported
slurred speech and occasional auditory hallucinations.  (*Id.*).  She reported difficulty paying
attention and completing tasks, due to confusion, forgetfulness, distraction, and poor
concentration.  (*Id.*).  Cranmer stated that she was able to follow written and spoken instructions
and was able to get along with supervisors or persons in positions of authority.  (*Id.*).  Cranmer
reported that she had memory issues and difficulty managing stress and changes in routine.  (*Id.*).

B.    <u>**Administrative Hearing Testimony**</u>

During the administrative hearing, Cranmer testified that she was thirty-eight and was not currently working.  (Tr. 113-14).  According to Cranmer, she was supported by her boyfriend.  (Tr. 114, 121).  Cranmer testified that she had completed high school and was able to read and write.  (Tr. 114).  Cranmer had stopped working in 2009, shortly after her mother's death.  (Tr. 114-15).  She had attempted to return to work a few months later, but had difficulty working due to pain in her arms, neck and shoulders and problems with concentration and pace.  (*Id.*).  Cranmer indicated that she was experiencing mental problems due to her mother's death.  (*Id.*).  According to Cranmer, her doctors had advised her against returning to work.  (*Id.*).

Cranmer testified that she suffered from PTSD, anxiety, and panic attacks, which prevented her from working.  (Tr. 120-22).  According to Cranmer, her PTSD was caused by the incident in which her husband had pointed a loaded gun at her.  (*Id.*).  Cranmer testified that she attended therapy sessions twice a month and was evaluated by a psychiatrist once a month.  (*Id.*).  Cranmer continued to experience panic attacks when in public, particularly around men.  (Tr. 122).  Cranmer testified that she was constantly scared in public because her husband and his associates had stalked her.  (*Id.*).

Cranmer testified that she was generally able to get along with others, including her boyfriend.  (Tr. 122-24).  Cranmer had been dating her boyfriend for approximately one year and had met him while visiting friends.  (*Id.*).  She reported trouble concentrating, remembering things, and staying on task.  (*Id.*).  She enjoyed watching television and reading books, although she typically could read only one or two chapters at a time.  (*Id.*).  Cranmer testified that she was able to care for her personal hygiene and prepare meals and that she and her boyfriend shared the household chores.  (Tr. 125).

Cranmer testified that she typically took her dog outside approximately four times a day, but not for long walks.  (Tr. 126-27).  She usually slept twelve hours a night and drank coffee and smoked cigarettes while watching the news for approximately an hour after awakening.  (*Id.*).  She was able to watch television, but not musicals, or sports events, or shows containing violence.  (*Id.*).  She was able to enjoy sewing.  (Tr. 128).

## DISCUSSION

### I.     Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

    (1)    whether the claimant is currently engaged in substantial gainful activity;

    (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

    (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.     The ALJ's Decision

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Tr. 90-102). Under step one of the process, the ALJ found that Cranmer had not engaged in substantial gainful activity since February 21, 2012, the application date. (Tr. 92). At step two, the ALJ concluded that Cranmer has the severe impairments of fibromyalgia, obesity, bronchial asthma with COPD, anxiety, PTSD, degenerative disc disease, depression, and anxiety. (*Id.*). The ALJ determined that Cranmer's irritable bowel syndrome, gastroesophageal reflux disease, and urinary incontinence were not severe. (*Id.*). At step three, the ALJ determined that Cranmer did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments. (Tr. 93-94). With respect to Cranmer's mental impairments, the ALJ found that Cranmer suffered from mild restrictions in activities of daily living and maintaining social functioning and moderate difficulties in maintaining concentration, persistence, and pace. (*Id.*). The ALJ concluded that Cranmer had the RFC to perform sedentary work, provided she avoided concentrated exposure to respiratory

irritants and was limited to unskilled work requiring only occasional use of stairs, ramps, squatting or bending and only frequent overhead reaching. (Tr. 94-101). The ALJ also concluded that Cranmer retained the ability to understand, carry out and remember simple instructions, respond appropriately to supervision, coworkers and usual work situations, and deal with changes in a routine work setting. (*Id.*). At steps four and five, the ALJ determined that Cranmer was not able to perform any past work, but that pursuant to the Medical-Vocational Guidelines (the "GRIDS") Rule 201.28, a finding of "not disabled" was warranted. (Tr. 101-02). Accordingly, the ALJ found that Cranmer was not disabled. (*Id.*).

       **B.**      <u>**Cranmer's Contentions**</u>

      Cranmer contends that the ALJ's determination that she was not disabled is not supported by substantial evidence and is the product of legal error. (Docket # 16-1). First, she challenges the ALJ's RFC assessment on the grounds that the ALJ failed to give appropriate weight to the opinion of Deines, Cranmer's treating psychiatrist. (*Id.* at 21-24). Next, Cranmer maintains that the ALJ failed to properly assess her credibility. (*Id.* at 24-27). Finally, she contends that the ALJ's step five determination was erroneous because the ALJ failed to consult a vocational expert. (*Id.* at 27-30).

**II.**      <u>**Analysis**</u>

      I turn first to Cranmer's contention that the ALJ's RFC assessment was flawed. An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities,

symptomology, including pain and other limitations which could interfere with work activities

on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009)

(citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant

evidence, including medical opinions and facts, physical and mental abilities, non-severe

impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL

1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d

Cir. 2010).

Cranmer argues that the ALJ improperly discounted the opinion provided by

Deines on February 3, 2012. (Docket ## 16-1 at 21-24; 19 at 2-3). "An ALJ who refuses to

accord controlling weight to the medical opinion of a treating physician must consider various

'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d

28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

(1)     the frequency of examination and length, nature, and extent
        of the treatment relationship,

(2)     the evidence in support of the physician's opinion,

(3)     the consistency of the opinion with the record as a whole,

(4)     whether the opinion is from a specialist, and

(5)     whatever other factors tend to support or contradict the
        opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010). The regulations also

direct that the ALJ should "give good reasons in her notice of determination or decision for the

weight she give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32

(quoting 20 C.F.R. § 404.1527(c)(2)). "Even if the above-listed factors have not established that

the treating physician's opinion should be given controlling weight, it is still entitled to

deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992, *4

(W.D.N.Y. 2008).  The same factors should be used to determine the weight to give to a

consultative physician's opinion.  *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011).

"However, if the treating physician's relationship to the claimant is more favorable in terms of

the length, nature and extent of the relationship, then the treating physician's opinion will be

given more weight than that of the consultative examining physician."  *Id.*

   The ALJ stated that she gave "partial weight" to Deines's opinion.  In doing so,

she acknowledged that Deines was Cranmer's treating physician and that Cranmer's psychiatric

symptoms limited her ability to perform skilled work.  She nonetheless concluded that Deines

understated[5] Cranmer's ability to engage in work activities on a consistent basis because his

overall assessment was inconsistent with Cranmer's treatment records, which demonstrated

improvement of her psychiatric symptoms with medication management.  Further, the ALJ

concluded that Cranmer's daily activities, including driving, sewing, and reading, were

inconsistent with the concentration deficits assessed by Deines.

   Having reviewed the decision, the record, and Deines's opinion, I conclude that

the two grounds provided by the ALJ for discounting Deines's opinion do not constitute "good

reasons."  First, I agree with Cranmer that the ALJ's conclusion that she demonstrated

improvement with psychiatric treatment is not supported by the record and is supported only by

selectively-chosen portions of Cranmer's treatment notes.  *See Younes v. Colvin*, 2015 WL

1524417, *8 (N.D.N.Y. 2015) (although an ALJ is free to credit only a portion of a medical

opinion, "when doing so smacks of 'cherry picking' of evidence supporting a finding while

rejecting contrary evidence from the same source, an administrative law judge must have a sound

---

[5]  In the decision, the ALJ concluded that Deines "overstate[d]" Cranmer's abilities.  Considering the opinion as a whole, the use of the term "overstate" was likely a mistake; presumably, the ALJ meant to conclude that Deines "understated" Cranmer's abilities.

reason for weighting portions of the same-source opinions differently"); *Phelps v. Colvin*, 2014 WL 122189, *4 (W.D.N.Y. 2014) ("[t]he selective adoption of only the least supportive portions of a medical source's statements is not permissible") (internal quotations and brackets omitted); *Caternolo v. Astrue*, 2013 WL 1819264, *9 (W.D.N.Y. 2013) ("[i]t is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination") (internal quotations omitted) (collecting cases); *Searles v. Astrue*, 2010 WL 2998676, *4 (W.D.N.Y. 2010) ("[a]n ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified").

As conceded by Cranmer, the treatment records demonstrate that her psychiatric symptoms were better managed through therapy and medication at some times than at others. As noted by the ALJ, during late 2011 and early 2012, Cranmer generally experienced improvement in her psychiatric symptoms with treatment; the notes reflect that although she continued to experience psychiatric symptoms, particularly during periods of stress from external factors, they were generally better controlled by her medications. (Tr. 97-98). The ALJ indicated that Cranmer appeared cooperative and coherent during her 2012 evaluation by Long and "continued to report that her current psychiatric medication regime worked adequately." (Tr. 98). Apart from these observations, the ALJ did not discuss any of the treatment notes from 2012 or 2013, other than to note that they demonstrated inconsistent attendance with treatment appointments. (*Id.*).

In making these observations, the ALJ overlooked or failed to discuss several treatment notes that suggest that Cranmer's improvement was inconsistent or short-lived. For instance, in February and March 2012, Cranmer reported increased anxiety and stress and requested additional therapy sessions to help her cope with the increased symptoms.

(Tr. 388-92).  Further, in March 2012 Cranmer presented as confused and unfocused with slowed

psychomotor activity and delayed speech.  (Tr. 393-97).  She reported a return of symptoms,

including auditory hallucinations, depression, anxiety, and occasional nightmares.  (*Id.*).

      Cranmer appeared to demonstrate a slight improvement in symptoms between

May and June and missed some appointments with Stager during that time period.  (Tr. 615-17,

656).  However, on July 21, 2012, Cranmer was admitted to the hospital for symptoms of

depression, anxiety, inability to talk, and derealization.  (Tr. 559-76).  That Cranmer was

hospitalized for significant psychiatric symptoms in July 2012 should have been evident to the

ALJ from the emergency room records (Tr. 559-76) and the FSCC treatment notes (Tr. 533-34,

539-40), both of which were submitted to the ALJ.[6]  The ALJ's failure to acknowledge or

discuss this important medical event is perplexing; it suggests that the ALJ either overlooked the

information altogether or purposefully omitted discussion of it in her summary of those treatment

records favorable to her conclusion.  Regardless of the reason, Cranmer's hospitalization for

significant psychiatric symptoms undercuts the ALJ's conclusion that the treatment records

demonstrate such improvement in Cranmer's psychiatric symptoms as to justify discounting her

treating psychiatrist's opinion of her limitations.

      The remaining records in the transcript also do not support the conclusion that

Cranmer experienced sustained improvement in her psychiatric symptoms.[7]  They demonstrate

---

[6] Cranmer also reported the incident in her disability report.  (Tr. 241).

[7] As noted above, some of the records summarized herein were submitted to and considered by the
Appeals Council, although not reviewed by the ALJ.  (Tr. 610-56).  Cranmer also relies upon treatment records,
which document a four-day psychiatric hospitalization of Cranmer in October 2013, and a medical source statement
that postdate the ALJ's decision, which the Appeals Council determined related to a later time.  (Tr. 10-15, 22-86).
Of course, even records that postdate the ALJ's decision should be considered by the Appeals Council if they are
both new and material.  *Miller v. Colvin*, 2015 WL 1431699, *13 (W.D.N.Y. 2015) ("[t]o require consideration by
the Appeals Council, the evidence must be both (1) new and not merely cumulative of what is already in the record
and (2) material, meaning both relevant to the claimant's condition during the time period for which benefits were
denied and probative") (internal quotations omitted).  Because I conclude that the evidence considered by the ALJ
and the Appeals Council that predates the ALJ's determination fails to support the ALJ's conclusion that Cranmer

that although Cranmer experienced some improvement in her symptoms at the end of 2012 and

the beginning of 2013, her symptoms subsequently returned.  In February 2013, Cranmer

suffered a significant setback due to an inability to afford her medications after being evicted

from her apartment and moving to Pennsylvania.  (Tr. 545-46).  At that time, Deines assisted her

efforts to obtain medication and even suggested psychiatric hospitalization due to the severity of

her symptoms, including suicidal thoughts.  (*Id.*).  During the summer of 2013, Cranmer

continued to experience psychiatric symptoms, including anxiety, paranoia, and nightmares, and

exhibited confusion and delayed responses.  (Tr. 640-50, 654-55).

   In sum, the record as a whole demonstrates that although Cranmer experienced

periods of improvement in her symptoms, she frequently suffered recurrence of her symptoms

that varied in severity.  The record suggests that her symptoms were aggravated by various

stressors, such as her family relationships, including her abusive husband and troubled son,

living circumstances (which included a period of homelessness), events that reminded her of her

mother's death and illness, and physical pain.  (Tr. 327-32, 337, 345, 347, 351-52, 355, 357, 361,

374, 376-77, 381, 392, 393, 395, 535, 537-39, 611, 620, 626, 640, 642).  Deines noted that these

stressors triggered her symptoms and interfered with her ability to function, concentrate, and

leave her house.  The record simply does not support the ALJ's conclusion that Cranmer

experienced a sustained improvement in her psychiatric symptoms.  Accordingly, I conclude that

the purported improvement did not constitute a "good reason" to discount Deines's opinion.  *See*

*King v. Colvin*, 2016 WL 1398987, *4 (W.D.N.Y. 2016) (ALJ's selective citation to

improvement in the treatment records warranted remand; "[w]here an ALJ mischaracterizes the

evidence or relies on only the portions of the record that support a conclusion of "not disabled," a

---

experienced sustained improvement in her psychiatric symptoms, I need not determine whether the additional
materials that postdate the determination are both new and material.

remand is necessary"); *Poczciwinski v. Colvin*, 158 F. Supp. 3d 169, 176-77 (W.D.N.Y. 2016) (remanding where ALJ failed to provide good reasons to accord less than controlling weight to the treating physician's opinion particularly where "the ALJ's discussion of the . . . treatment notes reflects a troublesome tendency to highlight only evidence of plaintiff's improvement in therapy, while neglecting the overall impact of the medical record, which supports [the treating physician's] assessment of ongoing and serious mood instability").

Moreover, Deines's opinion was authored at the beginning of 2012, when Cranmer was experiencing a period of relative improvement in her symptoms. Despite that improvement, Deines still opined that Cranmer's ability to engage in several work-related activities was moderately limited and her ability to function in a work setting on a consistent basis was very limited. (Tr. 305-06). In other words, in Deines's opinion, Cranmer's symptoms, although improved, continued to be severe enough to interfere with her ability to engage in work-related activities on a sustained basis. Thus, even if the record could be read to suggest that Cranmer had improved, such improvement would not necessarily justify the discounting of his opinion. *See Williams v. Colvin*, 2016 WL 5468336, *11 (W.D.N.Y. 2016) ("[t]he fact that [the treating physician] suggested, despite plaintiff's temperate improvements, that she was nonetheless severely restricted by her mental impairments and would suffer psychiatric harm working a routine and simple job should speak to the severity of plaintiff's impairments and not to any inconsistency in [the treating physician's] opinion") (citing *Garcia v. Colvin*, 2015 WL 7758533, *10 (S.D.N.Y. 2015) ("evidence of improvement alone, without an assessment of how any such improvement reduced the claimant's functional limitations such that they are no longer, or never were, marked limitations is insufficient[;] . . . [o]ne can show even significant relative improvement – but if the deficiency is sufficiently great, a marked limitation may remain)

(citations omitted)).  At the very least, the ALJ should have consulted Deines to determine

whether he continued to believe that Cranmer suffered from significant work-related mental

limitations and the basis for that opinion.  *See Bonet v. Astrue*, 2008 WL 4058705, *24

(S.D.N.Y. 2008 ) ("[i]t is unclear whether [the treating physician] was of the view that

[p]laintiff's condition had improved and if so, whether it changed his opinion about [p]laintiff's

ability to work[;] [i]f he persisted in his opinion that she was unable to work, the ALJ should

have provided him an opportunity to explain why he maintained such a position in spite of the

improved GAF scores").

I similarly reject the ALJ's conclusion that Deines's opinion was necessarily

inconsistent with Cranmer's activities of daily living.  Although a claimant's "pattern of daily

living" is an "important indicator of the intensity and persistence of [the claimant's] symptoms,"

*see* 20 C.F.R. § 416.929(c)(3), the ALJ failed to explain how Cranmer's activities were

inconsistent with Deines's opinion.  The ALJ simply stated that Cranmer's self-reported ability

to drive, sew, and read books was "incongruent with [Deines's] assessment regarding the

severity of the claimant's concentration deficits."  (Tr. 100).  Presumably, the ALJ believed that

such activities demonstrated an ability to sustain concentration and attention.  Yet, the ALJ failed

to recognize that the record did not evidence that Cranmer was able to perform any of those

activities on a sustained basis.  For instance, Cranmer testified that she enjoyed reading, but was

only able to read one or two chapters at a time.  (Tr. 124).  Further, the record demonstrates that

Cranmer was not always able to drive because her medications affected her ability to focus.

(Tr. 222; *see also* 611).

In any event, the activities identified by the ALJ are not necessarily inconsistent

with Deines's opinions that Cranmer would have difficulty performing work-related activities on

a consistent and sustained basis.  Thus, without further explanation from the ALJ, the record does not demonstrate how Cranmer's activities justify rejection of Deines's opinions.  *See Miller v. Comm'r of Soc. Servs.*, 2015 WL 337488, *22 (S.D.N.Y. 2015) ("[i]n giving 'little weight' to [treating physician's] opinion, the ALJ also reasoned that it was 'inconsistent with the extensive activities of daily living that the claimant was able to perform'[;] . . . [s]uch a conclusory statement, which does not identify which activities are being referenced, is insufficient to meet the ALJ's obligations to 'comprehensively set forth [the] reasons for the weight assigned' to the opinion") (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)).  Accordingly, I conclude that the ALJ failed to provide "good reasons" for rejecting Deines's opinions and remand is warranted.  *See Halloran*, 362 F.3d at 33 ("[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion").

On remand, the ALJ should state her findings and provide good reasons for rejecting Deines's opinions, if she still does, considering the length, nature, and extent of the treatment relationship; the frequency of examination; the degree to which Deines's opinion is consistent with the record as a whole; the relationship, if any, between Deines's specialty in the medical profession and Cranmer's particular impairments; and, the existence of any other factors that "support or contradict" Deines's opinion.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416. 927(c)(2)-(6).

Cranmer also challenges the ALJ's credibility analysis on the grounds that she failed to provide good reasons for discounting Cranmer's testimony.  (Docket ## 16-1 at 24-27; 19 at 4-6).  Finally, she challenges the ALJ's step five assessment because the ALJ failed to

consult a vocational expert.  (Docket ## 16-1 at 27-30; 19 at 6-7).  In light of my determination

that the ALJ erred in evaluating the opinion of Cranmer's treating physician, thus warranting

remand, I decline to reach Cranmer's other challenges.  *See Norman v. Astrue*, 912 F. Supp. 2d

33, 85 n.79 (S.D.N.Y. 2012) ("[b]ecause I find that remand is proper on the basis of the ALJ's

failure to properly develop the record and to properly apply the treating physician rule, I do not

reach plaintiff's arguments with respect to (1) the ALJ's determination of his RFC at step four

and (2) whether the ALJ carried his burden at step five of the analysis[;] [t]he aforementioned

legal errors cause the remaining portions of the ALJ's analysis to be inherently flawed"); *Balodis

v. Leavitt*, 704 F. Supp. 2d 255, 268 n.14 (E.D.N.Y. 2010) ("[b]ecause the [c]ourt concludes that

the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the [c]ourt

need not decide at this time whether the ALJ erred in assessing plaintiff's credibility").


## **CONCLUSION**

        For the reasons stated above, the Commissioner's motion for judgment on the

pleadings **(Docket # 18)** is **DENIED**, and Cranmer's motion for judgment on the pleadings

**(Docket # 16)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this

case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further

administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**


                                                   *s/Marian W. Payson*
                                              MARIAN W. PAYSON
                                    United States Magistrate Judge


Dated: Rochester, New York
      February 7, 2017